■ THE PEOPLE OF THE STATE OF NEW YORK, Respondent, v NGUYEN HOC, Also Known as HOC THAI VU, Also Known as THIN VU, Also Known as VU HOC THAI, Appellant.—Judgment, Supreme Court, New York County (Eve Preminger, J.), rendered October 26, 1987, convicting defendant, after a nonjury trial, of murder in the second degree, unanimously reversed, on the law and the facts, and the indictment dismissed.

The circumstantial evidence presented by the People fell short of the standard required for establishing the defendant's guilt of murder in the second degree. To support a finding of guilt based upon circumstantial evidence, the facts proved must exclude " 'to a moral certainty' " every reasonable hypothesis of innocence and the trier or fact may not "leap logical gaps in the proof offered and draw unwarranted conclusions based on probabilities of low degree". (People v Benzinger, 36 NY2d 29, 32 [1974]; People v Forestieri, 87 AD2d 523, 524 [1st Dept 1982].) Close judicial scrutiny of verdicts based on circumstantial evidence is required to ensure that the trier of fact has not relied upon "equivocal evidence to draw unwarranted inferences or to make unsupported assumptions" (People v Way, 59 NY2d 361, 365 [1983]; People v Kennedy, 47 NY2d 196, 201 [1979]; People v McLean, 107 AD2d 167, 168 [1st Dept], affd 65 NY2d 758 [1985]).

The defendant was accused of shooting Trung Nguyen in the early morning hours of August 31, 1986, following a dance at the Grand Ballroom on Grand Street in Manhattan. The People allege that the defendant fired the fatal shots from the passenger seat of a light-colored car which pulled alongside the commercial van driven by Trung. The alleged motive for the slaying was the personal animosity between the deceased and the defendant, arising from Trung's belief that the defendant had shot and seriously injured his friend Huu Huyh in January of that year.

Huu had been unable to identify his assailant and, although the police had questioned the defendant about that shooting, no one was ever arrested for it. Several months after Huu had been shot, Trung confronted the defendant at a dance in New Jersey. Huu testified that Trung led him to the defendant and lifted his shirt to show the defendant Huu's scars. He then demanded that the defendant pay $2,000 for Huu's medical expenses which, in fact, had exceeded $7,000. The defendant

denied responsibility for the shooting but, nevertheless, Trung insisted, saying "you did that and you have to pay or else." The defendant said "okay" but claimed he had no money. Trung told him he could pay Huu $200 monthly and the defendant replied that he would see what he could do.

Confrontations with the defendant over Huu's shooting occurred on two other occasions prior to Trung's murder outside of the Grand Ballroom. The defendant told his frined Jonathan Psan, who had accompanied him to a party in The Bronx, that Trung had accosted him in the bathroom and warned him to "watch out" because he had "a lot of friends". Later that evening, the defendant said that Trung "tried to get him" because he blamed him for shooting Huu. At another party that summer in Allentown, Pennsylvania, the defendant left after an altercation and went outside to Jonathan's car. Although the Assistant District Attorney asserted that the defendant had argued with Trung, Jonathan Psan, who had driven the defendant to the party, testified that the defendant told him it was "the guy in Queens", "who got shot", indicating that it was Huu who had "tried to get *[sic]* trouble with him". The defendant asked Jonathan to open the trunk so that he could get a gun from his bag because he wanted something with which to defend himself. Jonathan managed to get the defendant to calm down and return to the party without the gun.

At the dance on Saturday night, August 30th, Trung and the defendant were seen having a conversation which lasted about 30 minutes. According to the testimony of Thui Nguyen, a young woman who went to the Grand Ballroom with the defendant and some other friends, some time between midnight and 1:00 A.M., the defendant told her that he was leaving early because he was not feeling well. However, when she went outside after the dance ended at about 2:00 A.M., the defendant was standing in front of the dance hall. She walked over and expressed her surprise at seeing him still there. He told her "I've got things to do", and urged her to go home with their other friends. Thui crossed the street and spoke with some friends for a few minutes before walking up the street to where her friend Danny's car was parked. A few moments later she heard a noise which sounded like a firecracker. Someone told her that it was a shooting and she should get into the car, which she did. Thui estimated that 7 to 10 minutes had elapsed between the time she left the defendant standing in front of the Grand Ballroom and the time she heard the noise which sounded like a firecracker.

Three other witnesses, Long Son, Bych Quyen Duong and Dung Trang, also saw the defendant outside after the dance at about 2:00 A.M. Bych saw the defendant "right in front of the entrance near the curb." When she told him it was time to go home, the defendant replied, "go ahead * * * I'll go home later." Dung testified that he saw the defendant standing just to the left of the dance hall near a white sports car talking to friends, but he did not see the defendant enter the car. Long Son, a friend of Trung, however, stated that he saw the defendant standing across the street from the dance hall next to "his" car waiting for his girlfriends, who went over "to his car." He acknowledged, on cross-examination, that he had assumed the car belonged to the defendant because "he stood there and it must be his." Jonathan Psan, however, testified that, to the best of his knowledge, the defendant did not own a car. Long Son also said that he saw the defendant get into this small, light-colored car. Although he initially said the defendant entered the driver's side, he corrected this, saying it was the passenger's side.

Long Son, together with 9 or 10 other young people, got into the back of the van Trung was driving. The van proceeded east through the intersection of Grand and Lewis Streets, made a U-turn, came back and then stopped at the traffic light. While it was stopped, the light-colored car pulled up and words were exchanged between Trung and someone in the car before the shots rang out. Another young man, Long Sinh, the only witness to actually see a shot fired, was standing on the sidewalk facing the Grand Ballroom when he heard three shots behind him. Upon turning around, he saw the flash of a fourth shot as it was fired from the passenger's side of a small, white, four-door car, at the driver of the van. The car, which was facing in the same direction as the van, then sped away. Long Sinh was unable to describe the type of car, its license plates, or the persons inside it. He stated that he had never seen the car before.

The People's case hinged upon the testimony of Long Son, the only witness who directly tied the defendant to the shooting. Although the evidence is to be viewed in the light most favorable to the prosecution (People v Kennedy, 47 NY2d, supra, at 203), upon review of the record, substantial doubts arise as to the credibility of this witness whose testimony was embroidered with assertions about matters which he could not possibly have observed.

On direct examination, Long Son testified that when the van left with its passengers, heading east along Grand Street,

"his car" (the car in which the defendant was a passenger) "also began to proceed." However, Long Son could not have seen this, as he admitted on cross-examination, because there were no side windows or passengers' seats in the back of this commercial van. He was sitting on the floor and could not see through either the windshield or the driver's side window. Long Son, nevertheless, testified that while the van was making the U-turn, "Hoc's car was also next to ours and Trung was having a conversation with Hoc."

When asked how he knew that Trung was speaking to Hoc, Long Son claimed that he heard Trung greet Hoc by name. On cross-examination, however, he admitted that he could not hear the rest of their conversation from where he sat in the back of the van with two other people between Trung and himself. Tranh Minh, who was sitting directly behind Trung and was wounded in the arm during the shooting, testified that he heard Trung "talking to someone", but he did not know who it was. Quang Huynh, the owner of the van who was riding in the passenger's seat next to Trung, was the only witness in the van who actually saw the light-colored car pull up along the left side of the van and "a little bit over like, at the front of the van." However, he could not see anyone in the car and he only knew that Trung was having a conversation with someone outside the van.

The People maintain that this circumstantial evidence, together with evidence regarding the defendant's flight following the murder, his tacit admission of guilt in a telephone conversation with Thui Nguyen, and his inconsistent statements to the police establish his guilt beyond a reasonable doubt. We do not agree. Proof that the defendant was near the scene prior to the shooting and may have harbored ill will toward the deceased does not prove that he committed the crime. Unlike *People v Lagana* (36 NY2d 71 [1975]), where the defendant's flight from the scene immediately after the shooting and his attempt to evade capture strengthened the circumstantial evidence of his guilt, the evidence herein does not confirm the prosecution's contention.

The prosecution argued that the defendant "fled the jurisdiction" and this departure demonstrated his "consciousness of his guilt". According to the People's witness, Dang Nguyen, on the Friday before Labor Day 1986, he picked the defendant up from Los Angeles County airport at 5:00 A.M. We take judicial notice of the fact that Labor Day 1986 occurred on Monday, September 1st. The Friday before Labor Day would,

therefore, have been August 29th, placing the defendant in California one day before the dance at the Grand Ballroom.

Assuming, arguendo, that the defendant arrived in Los Angeles the Friday after Labor Day, other evidence negates the inference of flight prompted by consciousness of guilt. Bych Quyen Duong testified that the defendant told her two weeks before the murder that he was going away on business but that he could not tell her what the business was. Dung Trang also testified that in mid-September, while he was on vacation in California, he ran into the defendant. Jonathan Psan recalled that after he returned from vacation at the end of the summer, the defendant called him from California and invited him to come and visit him there. The fact that the defendant announced his plan to go away before the murder, then did not leave until five days after the murder and, while away, made no secret of his whereabouts, is evidence that his departure may have been prompted by motives other than consciousness of guilt.

Equally ambiguous is the evidence regarding a telephone conversation between the defendant and Thui Nguyen a week or two after the shooting. After chatting with the defendant for a few minutes, Thui told him "I could not believe what I have heard and he said that he didn't know what I was talking about." Thui again said, "You know", and the defendant replied, "No, I don't know. I don't know what you are talking about." Thui, however, insisted and eventually the defendant said, "Well, the other guy [Trung] threatened to kill me." Thui then told the defendant "I can't really talk to you and, you know, just don't call me again." That was the last time she heard from the defendant. She acknowledged, on cross-examination, that the conversation had transpired in both English and Vietnamese and she could not remember exactly what was said or what language it was said in. Nevertheless, the defendant's alleged remark remains equivocal. It is entirely possible that it was an explanation as to why Thui had heard the rumors about him, and not an admission of guilt.

The prosecution argued that the defendant's statement was a tacit admission of guilt, that Thui understood it as such and refused to have anything more to do with him. Although the prosecution speculates that the witness terminated her conversation with the defendant because she was shocked by his answer, the witness stated that she was not upset when she told the defendant "I can't believe what I heard". Thui also testified that prior to this conversation, when the defendant

called her just a few days after the shooting, "I was not allowed to talk on the phone. I didn't talk to him at all, my Mom was on the phone." This witness was never specifically asked why she terminated the subsequent conversation with the defendant. She may have done so for a variety of reasons, not least of which may have been parental disapproval of her association with the defendant, a young man of questionable reputation.

Finally, the prosecution points to the false, exculpatory statements the defendant made to the police after his arrest in February 1987. Initially, the defendant identified himself as "Vu Thu" and pretended not to recognize a photograph of himself. In a second interview about two hours later, the defendant said that he "wanted to tell the truth" and he identified himself as Hoc Vu. After being given the *Miranda* warnings, the defendant told Detective Gary DiBlasi that he had gone to California to "get away from the police harassing him" about the shooting in which Huu had been injured. He stated that he went to California but returned to New York when he could not find work. The defendant acknowledged that he had had a fight with Trung on one occasion which "almost came to blows." However, he denied shooting Trung and maintained that during the dance, members of the same gang that Trung belonged to came up to him and were bothering him. At about 11 o'clock, he told his friends that he didn't feel well and was going to leave. The defendant claimed that he took a taxi from the dance to his house, arriving at about 11:45 P.M., but no one was at home. He listened to music by himself until someone came home around 2:00 A.M. The defendant wrote out his statement and signed it, adding that he learned of Trung's death in the newspapers.

It is clear that portions of this statement were untrue. However, the fact that the defendant lied to the police regarding his whereabouts on the night Trung was shot provides only weak evidence that he was guilty of the crime. *(See, People v Marin,* 65 NY2d 741, 745-746 [1985].) Inasmuch as the defendant was suspected of having shot Trung's friend Huu, and he believed that he was being "harrassed" by the police because of this, his false statement is not inconsistent with a guiltless fear of further persecution.

Given the highly questionable testimony of Long Son, the only witness to link the defendant to the shooting, and the equivocal nature of the evidence offered to show the defendant's consciousness of guilt, a reasonable doubt persists. It

cannot be said that the inference of guilt is the only one which can be fairly and reasonably drawn from the facts proved in this case. Concur—Kupferman, J. P., Carro, Asch, Rosenberger and Wallach, JJ.